UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2:20-CR-72 |
| | ) | |
| JEREMY SMALLWOOD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Defendant has filed a Motion to Suppress [Doc. 51], a Supplemental Motion to Suppress[1]

[Doc. 71], and a Motion to Dismiss, or in the Alternative to Suppress[2] [Doc. 91]. These motions

are interrelated and have been considered together by the undersigned pursuant to 28 U.S.C. § 636.

For reasons set forth below, the Court **RECOMMENDS** the Motions [Docs. 51, 71, and 91] be

**DENIED**.

## I.   BACKGROUND

Defendant's alleged criminal conduct traces back to May 26, 2020, when Defendant was

shot during a dispute over a vehicle sale in Kingsport, Tennessee. [Doc. 51, p. 1].  When Kingsport

Police responded to the shooting, which had taken place near 1648 G Street in Kingsport,

Tennessee, they reported finding one firearm in the possession of Tyjuan Marsh and two near

Defendant, who had been shot and was lying on the ground. [Doc. 51, p. 1; Doc. 57, p. 1].

---

[1] The Court permitted this Motion to be filed after new discovery was disclosed on March 9, 2022. *See* [Doc. 71, p. 5].

[2] The Court permitted this Motion to be filed for the limited purpose of addressing the necessity of a *Franks* hearing based on the discovery disclosed for the period of January through March 2022. [Doc. 90]. While the United States correctly notes that the Motion goes beyond the purpose for which it was permitted, the Court has chosen to consider the other matters addressed as they relate back to Defendant's original suppression requests.

Kingsport, Tennessee Police Officer Justin McConnell prepared a supplement on May 28, 2020 detailing the events described above. Therein, Officer McConnell states in part:

> On 5/26/2020 around 2245 hrs. officers of the Kingsport Police Department responded to the area of 1648 G Street in reference to a shooting. A male was found laying in the roadway with multiple gunshot wounds. He was identified as Jeremey Smallwood and was transported form the scene to Holston Valley Medical Center by Sullivan County EMS. Officer Coffey observed a male subject later identified as Tyjuan Marsh placing on [sic] object on the ground. When Officer Coffey shined his flashlight in the direction of this male and saw the object was a handgun. Coffey drew his firearm and order the male to the ground. Marsh stated that the man laying in the street tried to shoot him. Officers secured the scene and began interviewing witnesses. Det. Moody and Det. Dunworth processed the scene which was confined to the street in front of the residence. Det. Dunworth took multiple photographs and documented the location of evidence with placards. Tyjuan Marsh was transported to the Police Dept. by Officer Coffey to be interviewed by Det. Ewing.

[Doc. 92-1]. In further detailing the investigation that took place on May 26, Officer McConnell's supplement details interviews that were conducted with several witnesses at the scene. Lieutenant Chambers interviewed James Derick Smallwood, the brother of Defendant. James Smallwood says he only saw Tyjuan Marsh with a gun. Detective Clare interviewed Blake Rogers, who was at the scene and was disgruntled with Defendant over a motor vehicle sale. Mr. Rogers advised Detective Clare that immediately before Tyuan Marsh Shot Defendant, he saw Defendant pull two guns from his person. Officer McConnell interviewed Kaitlin Williams, Mr. Rogers' girlfriend. Ms. Williams reported that she had heard shooting but could not say who had pulled a gun first; however, Ms. Williams advised she had seen Tyjuan Marsh go over to the Defendant and kick two guns away from his person. Later, on May 28, 2020, Detective Ford interviewed Alexis Castle who had been outside when the shooting took place. Ms. Castle reported that she saw Defendant pull a gun from his waistband and say, "watch this." At that point, Ms. Castle recalled Tyjuan who she referred to as "Cho" shooting Defendant multiple times before walking over to him and shooting him one or

2

two more times. According to Officer McConnell, Defendant remained in critical condition at the time his May 28, 2020 supplemental report was filed.

Later, On August 7, 2020, law enforcement officers requested forensic testing of the weapons and magazines found near Defendant and on October 7, 2020, received results reflecting that Defendant's fingerprints had not been located on those guns or associated magazines. [Doc. 51, p. 2]. The motions in question address actions taken by law enforcement officers before they received the October 7, 2020 fingerprint analysis. The Court will now briefly address the facts related to the issues raised by Defendant.

### a. *Arrest of Defendant Jeremy Smallwood*

On August 13, 2020, Judge William K. Rogers of Sullivan County, Tennessee issued a warrant for Defendant's arrest based on Defendant's failure to comply with conditions of his state probation. *See* Government's Hearing Ex. 1. The basis provided to establish probable cause for the arrest warrant was primarily that officers had found two firearms in Defendant's constructive possession when they investigated the May 26, 2020 shooting, namely, a Ruger LCP .380 caliber semi-automatic pistol with five rounds in the magazine and one in the chamber and a Ruger EC9 semi-automatic pistol with four rounds in the magazine and an empty chamber. *Id*. With warrant in hand, on August 17, 2020, officers surveilled Defendant's home with the intention of arresting him. Around five o'clock that afternoon, Defendant was observed leaving his home in a blue Chevrolet Camaro at which time officers conducted a *Terry* stop. [Doc. 51, p. 2]. During the stop, Defendant was initially seized and placed in handcuffs. As officers were assisting Defendant from the car, they observed him attempt to place a small bag in his pocket which ultimately dropped to the ground. Upon examination, officers determined that the bag appeared to contain heroin. Based on this observation, law enforcement conducted a K9 sniff of the car. After the K9 alerted, officers

3

searched the vehicle and found cannabis, a Bersa handgun, a Glock model 33 handgun, a Glock model 21 handgun, $1,076.00 in U.S. currency, a Glock magazine with 19 rounds of ammunition, and two Apple iPhones. Defendant was then transported to the Sullivan County Jail. Once at the Sullivan County Jail, Defendant made incriminating statements involving his possessory interest in illegal substances located in his vehicle before undergoing the intake process. While being transported to the federal courthouse the following day for an initial appearance on a Criminal Complaint which had been issued against him, Defendant again made incriminating statements regarding the illegal substances found in his vehicle. Defendant now seeks to suppress the items discovered in his vehicle during the stop and the statements he made to law enforcement officers thereafter. These matters were addressed during an evidentiary hearing and are further expounded upon in the following sections of this report.

### b. *Search warrants for Jeremy Smallwood's residence and cell phone*

Defendant further challenges three search warrants which permitted the Government to: 1) obtain his GPS and cell site location data, 2) search his home located at 105 Ivy Dale Drive Kingsport, TN, and 3) search his red iPhone that was seized during his arrest. The United States has represented that it will not seek to introduce information obtained from the GPS and cell site location warrant. Given this concession, the Court will not address this issue further except to note that the Government will not be permitted to introduce any information obtained utilizing this warrant given its expressed intention not to do so and the Court's reliance on the assertion. The Court will now turn to the remaining two warrants.

On August 14, 2020, Sullivan County Detective Chris Farmer sought to search Defendant's residence at 105 Ivy Dale Drive, Kingsport, Tennessee. He asserted that there was probable cause for the warrant to issue based on information obtained from a concerned citizen about unlawful

4

activity the informant had observed while providing lawful services to Defendant within his home. [Doc. 82-2]. In internal notes collected about Defendant, law enforcement officers identify the concerned citizen as Defendant's home health nurse. *See* [Doc. 71-1]. Those notes further indicate that Defendant's State Probation Parole Officer Drew March received a call from Defendant's former home health nurse alerting officers to unlawful activities purportedly occurring at Defendant's residence. [Doc. 71-1, p. 2]. While the home health nurse did not specify the dates of her employment, she advised that she had observed Defendant selling drugs, using drugs including heroin, and possessing at least three firearms in his home. *Id*. at 2. The nurse-informant stated that Defendant kept a black pistol under his pillow, another pistol elsewhere in the house, and a long gun that state probation officers were told Defendant had stated was an AK-47. *Id*. at 2. The nurse-informant characterized Defendant as becoming increasingly paranoid, which frightened her and led her to discharge him as a patient. *Id*. at 3. The warrant repeats this information while shielding the informant's identity. *Compare* [Doc. 71-1] and [Doc. 82-2]. Defendant now argues the informant violated federal law governing disclosure of healthcare information and for that reason, the information provided should be deemed unreliable. For these reasons, Defendant seeks to have the incriminating items recovered during the search suppressed. *See* [Doc. 71, pp. 13-14].

On August 20, 2020, ATF Agent Jamie L. Jenkins was issued a search warrant for the red Apple iPhone seized from Defendant at the time of his arrest. *See* [Doc. 82-3]. Probable cause for searching the iPhone was premised on the citizen informant's tip that is described above; state probation and parole's visit to Defendant's home on August 3, 2020, at which time probation officers observed a vehicle at Defendant's residence that was affiliated with the primary suspect in an ongoing drug and weapons investigation; an August 11, 2020 anonymous tip that Defendant was selling heroin from his 105 Ivy Dale address; the presence of firearms and illegal drugs in

Defendant's vehicle and/or person at the time of his arrest; and law enforcement's knowledge of the methods in which individuals engaged in drug trafficking activities use cell phones. Defendant argues these facts do not separately or in sum provide the probable cause necessary to permit a search of the cell phone. *See* [Doc. 71, pp. 11-13].

## II.    EVIDENTIARY HEARING

On March 7, 2020. the Court conducted an evidentiary hearing. At that time, the Court heard testimony from Detective Jeff Dotson, Lieutenant Burk Murray, Detective Derrick Shaffer, K9 Officer Justin Bays, Detective James Legg, and Detective Daniel Lane.

### a.  *Detective Jeff Dotson*

The Court first heard from Detective Jeff Dotson. Detective Dotson works for the Sullivan County Sheriff's Office and is assigned to the Drug Task Force. On August 17, 2020, Detective Dotson and approximately six to seven other officers were conducting surveillance at Mr. Smallwood's residence located at 105 Ivy Dale Drive. Detective Dotson testified that he was directed to surveille Defendant's residence based on Defendant's active warrant for a probation violation[3] and because Detective Farmer, also with the Sullivan County Sheriff's Department, had told him he had a search warrant for the residence as well. During this surveillance, which lasted approximately three hours, Detective Dotson was located about 125 to 150 yards from the residence along a wood line at a storage facility across an adjacent field and was using binoculars to watch the home. Given information that officers had about Defendant, they decided to conduct surveillance on his residence in hopes of identifying an opportunity to serve his arrest warrant on him outside of his residence for safety reasons. [4]

---

[3] A copy of the arrest warrant was entered into evidence as Exhibit 1.

[4] On cross examination, Detective Dotson was asked whether it would not have been safer to arrest Defendant at his home as opposed to in the parking lot of a business where he was ultimately arrested. Detective Dotson advised that it was not his decision as to where Defendant would be arrested.

6

Around 5:00 p.m., while surveilling Defendant's residence, Detective Dotson observed Defendant and a black male in his twenties exit the house and get into a blue Camaro. The detective thought he remembered there being Virginia plates on the vehicle but could not recall a license number. Officer Dotson testified that he could see Defendant very clearly while the black male assisted him from the residence to the car in a wheelchair but admitted he did not remember what Defendant was wearing. Defendant then got into the driver's seat and the black male sat in the passenger's seat. Detective Dotson stated that he recognized Defendant from driver's license and criminal history photos he had been shown by Detective Farmer, noting that Defendant had distinct facial tattoos. As he watched the Camaro depart, Detective Dotson was on the phone with Sergeant Burk Murray to advise Sergeant Murray that Mr. Smallwood and an unknown male had left the residence. At that time, Sergeant Murray set the wheels in motion for other officers to stop Defendant's vehicle so his arrest warrant could be served on him, and he could be taken into custody.

    b. *Lieutenant Burk Murray*

The Court next heard from Lieutenant James "Burk" Murray[5] of the Sullivan County Sheriff's Department. Lt. Murray, a twenty-nine (29) year veteran of law enforcement, advised the Court of his role in the August 17 surveillance operation. On the afternoon of August 17 at approximately 5:00 p.m., Lt. Murray testified that he was in the parking lot of a strip mall where Dashboard Audio is located when he received a call from Detective Dotson telling him Defendant had left his residence. In reliance on that message, Lt. Murray radioed other law enforcement

---

[5] Lieutenant Murray was Sergeant Murray at the time these incidents took place but had been promoted to Lieutenant by the time he testified at the hearing which is the reason for him being referred to by both titles. During cross examination, Lieutenant Murray testified that he had been fired from his position with the Kingsport City Police Department in 2005 for conduct unbecoming of an officer; however, the Court finds that the circumstances surrounding the incident which led to his termination does not bear on credibility and further notes that the incident occurred seventeen years ago.

7

officers to advise that Defendant had left his residence in a blue car with an unknown black male in the passenger seat. Defendant could only turn onto one road when exiting his subdivision but that road quickly dead ends into Highway 36, known as Kingsport Highway, where Defendant was required to either make a right or left. Lt. Murray advised that the Camaro turned left toward the strip mall. At that point, a marked law enforcement vehicle driven by Officer Shaffer pulled onto Kingsport Highway behind Defendant. As Defendant approached the strip mall, he started slowing down like he was going to turn in and appeared to start pulling into the parking lot at the same time the officer behind him got his lights on. K9 Officer Bays pulled in behind Officer Shaffer, with Officer Legg already being present in another part of the parking lot.

From his location in the same lot, Lt. Murray testified that he was able to recognize the driver as Defendant. In fact, Lt. Murray noted that he and Defendant had previously had face-to-face conversations regarding other investigations and that Defendant knew him well enough to call him by name when they spoke later in the parking lot. On cross examination, Lt. Murray acknowledged that he had not had any actual conversations with Defendant prior to the date in question but instead had face-to-face contact with him. Lt. Murray again stated that Defendant knew who he was, noting that Defendant called him by "Burk." Additionally, Lt. Murray was asked if other officers involved in the operation related to Defendant would have had knowledge about Defendant's appearance. Lt. Burke testified that they all had access to pictures of Defendant and the officers who did not know him were directly shown the photographs on the day of the operation prior to it commencing.

As to officers' interaction with Defendant, Lt. Murray initially testified on direct that Officer Legg was the first to approach Defendant's car, approaching on the driver's side to speak with Defendant. On cross examination when asked further questions about which officers

8

approached the car, Lt. Murray said he misspoke on direct and that it was Officers Shaffer and Bays who went to the driver's side and Officer Legg went to the passenger's side. Lt. Murray testified that while other officers were interacting with Defendant, he was coordinating next steps with the officers who had been conducting surveillance of Defendant's home.

Lt. Murray stated that he was shown some of the items that other officers found in Defendant's car but that he was not involved in the search. He testified that Defendant's car was towed from the scene within two hours and that Defendant was transported prior to the vehicle being towed. Lt. Murray acknowledged that Defendant was placed on the ground in the parking lot leaned up against something for "probably an hour or more" but he did not think it was as much as two hours.

### c. Detective Derrick Shaffer

The Court next heard from Detective Derrick Shaffer. In August 2020, Detective Shaffer was serving as a deputy patrolman. On the day in question, Detective Shaffer had not yet been promoted and was serving as a deputy patrolman assisting vice and narcotics with the Smallwood investigation. He was shown a photo of Defendant to assist in his apprehension, which on cross examination he described as depicting a "white male, no hair, bald, tattoos all over his face." As part of the operation, Detective Shaffer was located near Ft. Henry Drive near the county line. Detective Shaffer explained that Ft. Henry Drive turns into Kingsport Highway as the road crosses into Washington County, Tennessee. According to his testimony, his patrol car would have been visible from the turn off into Defendant's subdivision. While at his appointed location, Detective Shaffer received radio communications from Lt. Murray advising that Defendant was headed in Detective Shaffer's direction in a blue Camaro. Upon spotting the car and a driver appearing to match Defendant's description, Detective Shaffer pulled onto Ft. Henry Drive and began following

it but did not activate his lights and siren. Detective Shaffer testified that shortly thereafter, after they had traveled about a quarter of a mile, Defendant turned on his signal light and pulled off into the strip mall parking lot where Dashboard Audio was located. At that time, Detective Shaffer said he turned on his blue lights. Once Defendant was fully stopped, Detective Shaffer approached the driver's side of the vehicle and was able to identify Defendant based on the photo he had seen. He advised Defendant that he was conducting a traffic stop because he had an arrest warrant for him out of Sullivan County. At that point Detective Shaffer asked Defendant to exit the vehicle. Detective Shaffer said that while he was working with Defendant, Officer Bays oversaw the passenger.

After Detective Shaffer asked Defendant to exit the vehicle, Defendant explained that he could not do so without assistance due to an injury. Detective Shaffer then opened the driver's side door to help Defendant out of the vehicle. Meanwhile, Detective Shaffer testified that K9 officer Bays was placed in charge of the passenger. While helping Defendant out of the car, Detective Shaffer saw Defendant remove a large sum of money and pass it to the passenger. He further observed the end of a black handgun sticking out from under the driver's side seat where Defendant had been sitting. Detective Shaffer took possession of the firearm and handed it off to another officer on the scene. He stated that while he handled the firearm Officer Bays was attempting to assist Defendant out of the vehicle. During this process after Detective Shaffer rejoined Officer Bays, the detective observed a baggie in Defendant's hand that he was trying to hide in his pocket, which fell onto the ground as Detective Shaffer and Officer Bays were removing Defendant from the vehicle. Upon further observation, Detective Shaffer identified the baggie as containing a substance which appeared to be heroin. Detective Shaffer advised the Court that this discovery

10

caused him concern about whether there might be fentanyl mixed with the heroin because that is often the case.

Detective Shaffer admitted he could not recall whether he or Officer Bays cuffed Defendant. He did recall Defendant being placed into a seated position on the ground in the strip mall parking lot where he could lean against another vehicle. Detective Shaffer testified that the spot was shaded by the building due to the hour of the day, and Defendant was placed there to await transport. Detective Shaffer himself did not know the specifics regarding who transported Defendant because he was not involved in the process. At the same time, Detective Shaffer did note that while Defendant was outside for over an hour it was less than two hours. When asked whether he knew if the passenger was transported from the scene within about twenty minutes, Detective Shaffer said that he didn't recall because he had no interaction with the passenger.

While Detective Shaffer did not mention Officer Legg on direct examination, when asked where the officer was while he and Officer Bays were at the driver's side door of Defendant's vehicle, he stated that he believed that Officer Legg had approached the passenger's side door. Additionally, Detective Shaffer was asked how he was able to observe a gun sticking out from under Defendant's seat given Defendant's size and the small size of the compartment in a Camaro sports car. He stated that he could see it when he was standing up with his back to the driver's door bent over to help Defendant get his legs out of the vehicle.

### d. K9 Officer Justin Bays

The Court next heard from Officer Justin Bays. Officer Bays testified that he has worked for Sullivan County since 2015 and was serving as a K9 officer during the August 17 incident. Officer Bays advised that as a K9 officer, he is required to undergo extensive, ongoing training and noted that the National Narcotic Detector Dog Association has certified him as a K9 officer.

11

Additionally, Officer Bay's K9, Jagger, has been certified by the Association. The certifications are renewed annually.

      As to the events which occurred relating to Defendant, Officer Bays testified that at approximately 5:00 p.m. on the day Defendant was arrested, he was close to the strip mall where Defendant was ultimately arrested meeting with Deputy Shaffer. Officer Bays testified that Deputy Shaffer had asked him to come and sit with him because he thought Officer Bays might be needed in conjunction with Defendant's arrest. Officer Bays stated that he could not hear the radio traffic regarding the efforts to arrest Defendant because it was taking place on a vice channel to which he did not have access. He was instead relying on Deputy Shaffer for information. Because of the way Officer Bays' car was positioned so that he could speak with Deputy Shaffer he was unable to see Defendant's vehicle when it first pulled onto Ft. Henry Drive. Instead, Officer Bays saw Detective Shaffer put his vehicle in drive and pull out, so he turned his own vehicle around and followed. At that point he was able to see Defendant's blue Camaro. Officer Bays testified that he saw Defendant pull in at Dashboard Audio at which time Deputy Shaffer engaged his emergency lights. Officer Bays engaged his at that time as well.

      Officer Bays stated that he and Deputy Shaffer approached the driver's side door together while Officer Legg approached the passenger's side door. Officer Bays said that he immediately recognized Defendant upon seeing him, but that Defendant had rolled the window down at that point. Officer Bays noted that the windows were tinted in the rear side and from the back you could not tell how many occupants there were but did not say that the front windows were similarly tinted.

      Officer Bays testified that he helped Deputy Shaffer remove Defendant from the vehicle because Defendant said he had to have help. Officer Bays recalled that while they were trying to

help Defendant out of the vehicle, he heard Deputy Shaffer say "gun" to alert him to the presence of a firearm in the vehicle. At that point, Officer Bays remembers taking control of Defendant while Detective Shaffer took control of the gun. Meanwhile, Officer Legg remained stationed at the passenger side of the vehicle. Turning his focus to extracting Defendant while maintaining a secure scene, Officer Bays recalled holding onto Defendant's wrists as Defendant was extracted from the vehicle. As Defendant was being removed, Officer Bays remembers seeing Defendant passing a wad of cash to the passenger. He also recalls Defendant trying to shove something into his pocket and watching the item fall to ground. He said that what Defendant dropped was a white and brown substance.

After Defendant and the passenger were extracted, which took several minutes, Detective Lane asked Officer Bays to run his canine around the vehicle. Officer Bays said his dog alerted to the presence of drugs on the driver's side of the vehicle and also entered the vehicle, going into the rear passenger seats.

When prompted with a question regarding the timeline of the seizure and transport, Officer Bays advised he could not recall when Defendant was transported. Officer Bays explained that he left the scene while Defendant was still secured on the ground to return to Defendant's home to undertake a search. Officer Bays did remember arriving back at the Sullivan County Jail later that evening to complete paperwork. He remembered sitting with Defendant briefly because intake could not immediately process Defendant when he arrived due to COVID-19 protocols and the processing of a female inmate. The Officer who had transported Defendant had to go inside to determine when Defendant could be processed and requested that Officer Bays sit with Defendant until he returned. During this time, Officer Bays and Defendant were located outside the facility adjacent to an awning and some benches within a secured, gated area portion of the jail's perimeter.

Officer Bays testified that he did not attempt to question Defendant but did ask him about his injuries. Defendant explained that he had been shot and was in pain. Officer Bays then advised Defendant that he should request medical treatment before going through intake. Officer Bays further testified that Defendant kept talking to him while they waited, explaining to the officer that he used the heroin he had with him when stopped to help him with his pain, and that he was a drug addict. Additionally, Defendant told him that there was marijuana in the vehicle as well, which at that time, Officer Bays did not know. Officer Bays explained that he was simply listening to Defendant at that point and was asking no questions at all. Officer Bays then memorialized in writing the statements Defendant made to him, and that document was entered into evidence as Exhibit 5 at the hearing in this cause.

e. *Detective James Legg*

The Court next heard from Detective James Legg with the Sullivan County Sheriff's Office. Detective Legg, who was a patrol officer at the time of the incident at issue, testified that he was on patrol on August 17, 2020, and arrived at Dashboard Audio in a marked patrol car at about 5:00 p.m. He was aware that there was an outstanding warrant for Defendant's arrest. Additionally, Detective Legg was personally familiar with Defendant because he had previously worked at the Sullivan County Jail while Defendant was incarcerated at the facility. Detective Legg heard over the radio that Defendant's vehicle was approaching in his direction, and then he saw the vehicle described as Defendant's pull into the Dashboard Audio parking lot where he was located. At that time, he says he circled his car around in the parking lot and approached Defendant's vehicle from the passenger's side.

Detective Legg testified that Curtis Thompson identified himself as the passenger. At that point, Detective Legg said that he heard Officer Shaffer say that there was a gun in the vehicle at

which time he asked Mr. Thompson if he had any firearms. Mr. Thompson advised that he had a firearm in his waistband, which Detective Legg then recovered. Thereafter, following the K9 being run around the vehicle, Detective Legg stated that he participated in a search of the vehicle during which he located a black, zipped bag behind the driver's seat which he opened. The bag contained a handgun and what appeared to be marijuana. After conducting a partial search, Detective Legg stated that Detective Danny Lane took over the search.

On cross examination, Detective Legg was asked about whether Mr. Thompson had possession of the bag. Detective Legg testified that he believed that the bag had been in Mr. Thompson's lap when the vehicle was stopped and that he moved it to the back seat as officers approached. Detective Legg explained that Detective Lane would have simply misunderstood if he stated that the bag was seized directly from Mr. Thompson because Detective Lane was not present when Mr. Thompson had possession of it and then placed it in the bag seat.

### f. Detective Daniel Lane

The final witness called to testify on behalf of the Government was Detective Daniel Lane with the Sullivan County Sheriff's Department. Detective Lane did note that while he was still employed by the Sheriff's Department that his time there was about to come to an end because he had taken a job with the Tennessee Bureau of Investigation. Detective Lane testified that he was involved in Defendant's arrest and the search of his vehicle and noted that this was his first interaction with Defendant. Prior to Defendant arriving at the Dashboard Audio parking lot, Detective Lane advised that he had been situated near Officers Bays and Shaffer. When the call came out over the radio that Defendant was leaving his residence[6], Detective Lane let the other

---

[6] It is unclear from Detective Lane's testimony whether he remembers a description of the vehicle Defendant was driving being provided. He testified that he was already aware of the type of vehicle Defendant was known to drive. Other officers testified that they were advised by radio that Defendant was traveling in a blue Camaro.

officers go on, but he remained behind and left three to four minutes later. While Detective Lane noted that he could not see the road where Defendant would have exited, he further stated that he was located further back from the patrol officers.

When he arrived, Detective Lane said that he saw Defendant sitting on the ground in handcuffs near his Camaro and observed the passenger to be standing with Detective Legg on the passenger's side of the vehicle. At that time, according to Detective Lane, he spoke to Defendant, introduced himself and told Defendant he was with ATF, and advised Defendant of his *Miranda* rights. Officers Shaffer, Bays, and Legg were all within earshot while this took place. After telling Defendant that Agent Jenkins was on the way to speak to him, Detective Lane proceeded to conduct a further search of Defendant's vehicle. He found a grocery style bag containing 22 packages of plant material and edibles that were labeled THC. Additionally, he found a magazine to a Glock pistol between the passenger seat and center console. Additionally, the black bag in the back seat containing a pistol was still there as well as the firearm which had been found under Defendant's seat. Detective Lane stated that he was told about a package of a powder substance which had been found during the arrest as well. Ultimately, Detective Lane did interact further with Defendant, obtaining information from him about the vehicle's owner so he could communicate with the owner regarding what to do with the vehicle. Additionally, at Defendant's request, he provided telephone numbers out of Defendant's phone to him for his use at the jail.

Detective Lane testified that Defendant was transported from the scene at approximately 6:10-6:15 p.m. and he recalled Deputy Eddie McClellan being the officer who transported Defendant to the Sullivan County Jail. Detective Lane stated that he did not take notes on the scene but did prepare notes following the operation.

Once Defendant was at the Sullivan County Jail, Detective Lane attempted to question him, but at that time Defendant told him that he did not want to talk. The following day, Detective Lane saw Defendant again because he and Detective Jacob Yeager were tasked with transporting Defendant to the federal courthouse in Greeneville for an initial appearance. Detective Lane testified that he initially reminded Defendant that he had been given his *Miranda* warnings the day before and then starting engaging Defendant in conversation. Detective Lane said that when he asked Defendant about the guns and drugs found in his vehicle, he admitted that the drugs were his but said the firearms belonged to his passenger. Both Detectives Lane and Yeager then memorialized Defendant's statements in writing and those statements were entered into evidence as collective Exhibit 7.

### g.  *Witness credibility*

The Court carefully assessed the credibility of each witness who testified during the suppression hearing. While there were some conflicts in the testimony provided, the Court finds no evidence of any witness providing misleading or intentionally inaccurate testimony. In fact, the Court would be more concerned if the testimony of all witnesses perfectly matched one another. When the testimony is taken as a whole, when coupled with the Court's observations of the witnesses during the hearing, the Court finds that the witnesses provided credible testimony.

## III.  LEGAL ANALYSIS

### a.  *Sufficiency of the arrest warrant*

Defendant first challenges the sufficiency of the probable cause statement in his arrest warrant. He asserts that officers only sought the arrest warrant because they had received a tip from Defendant's home health nurse about activity allegedly occurring in his home and that the statement of probable cause regarding Defendant's alleged possession of guns on the day that he

was shot which was used to obtain the warrant was simply a subterfuge. In reliance on an email sent by Lieutenant Steve Summey with the Kingsport Police Department, Defendant further attacks the accuracy of the statements made in support of probable cause, contending that all three guns at the scene of Defendant's shooting were found near the person who purportedly shot Defendant rather than two of the three being found within reach of Defendant. *See* [Doc. 71-1, p. 1]. In counter to that contention, the United States offered the statement of Officer Justin McConnell detailed above. [Doc. 92-1]. Therein, Officer McConnell outlined statements taken from witnesses, including more than one who witnessed the shooting. More than one of those witnesses provided a detailed description of how Defendant had possessed and drawn two firearms prior to being shot. Additionally, those witnesses confirmed that the two firearms were located near Defendant after he was shot and that the person who shot him kicked the firearms further out of Defendant's reach.

In considering the issue, the Court notes that "[p]robable cause is not a high bar." *United States v. Baker*, 976 F.3d 636, 645 (6th Cir. 2020), *cert. denied,* 141 S. Ct. 1750 (2021) (cleaned up). For an arrest warrant to issue, there must only be a showing of probable as opposed to actual criminal conduct. *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018). "Probable cause requires officers to 'show more than mere suspicion ... [but] does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt.'" *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008) (quoting *United States v. Strickland,* 144 F.3d 412, 416 (6th Cir.1998)). "To determine whether an officer had probable cause to make an arrest, a court must examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police

officer, amount to' probable cause. *"Maryland v. Pringle*, 540 U.S. 366, 366 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

Here, Defendant was involved in a shooting in May 2020 and was observed by certain witnesses to have drawn firearms and then to have had him near his person after he was shot. While other witnesses painted a different picture, the statements and evidence obtained by law enforcement officers was more than sufficient to provide probable cause to believe that Defendant had violated his state probation by possessing a firearm. [Doc. 92-3]. Defendant has correctly noted that the brief email sent by Lieutenant Summey indicates all three firearms were lying close to the person who was alleged to have shot Defendant, with that person standing at the time, when the lieutenant arrived. [Doc. 71-1]. However, Lieutenant Summey further stated that three other officers were on the scene before him. Lieutenant Summey does not provide any information in the email regarding where Defendant was in relation to the weapons when the initially responding officers arrived. Lieutenant Summey's email, without more, is insufficient to allow the Court to conclude that the statement made by Probation Officer Drew Marsh that Defendant had possessed two handguns was inaccurate[7].

The fact that an arrest warrant was not sought closer in time to Defendant's alleged possession of two handguns during the May 2020 shooting incident and prior to the receipt by Defendant's probation officer of other information regarding Defendant's alleged ongoing criminal conduct is irrelevant. Defendant's probation officer believed Defendant to have been in possession of firearms on the date he was shot, which provided a sufficient basis for a finding of probable cause that Defendant had violated the terms of his probation and as a result a warrant was issued for Defendant's arrest. As such and for the reasons stated above, the undersigned

---

[7] Officer Marsh relied upon what he had been told by Agent Jamie Jenkins in making the statement that Defendant possessed two handguns.

recommends that Defendant's request to suppress evidence obtained during his arrest, because he claims there was not probable cause for the arrest warrant to issue in the first instance, be **DENIED**.

### b. *Constitutionality of the stop and seizure*

Having addressed the sufficiency of the arrest warrant, the Court now turns to the question of whether the *Terry* stop made to execute the warrant passes constitutional muster. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons…against unreasonable searches and seizures." U.S. Const. amend. IV. There are three categories of interactions between police officers and members of the public: consensual encounters where the contact is initiated by law enforcement; a temporary, involuntary detention, or *Terry* stop, which must be supported by reasonable suspicion; and arrests which are supported by probable cause. *United States v. Lewis*, 842 F. App'x 683, 688 (6th Cir. 2021) (citing *United States v. Campbell*, 486 F.3d 949, 953-54 (6th Cir. 2007)). The Supreme Court has stated that "an automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996). A stop is not "unreasonable" where officers possess a valid warrant for persons known to officers to be travelling in a vehicle before they stop that vehicle. *United States v. White*, 162 Fed. App'x. 520, 523 (6th Cir. 2006) (applying *United States v. Hudson*, 405 F.3d 425, 432 (6th Cir. 2005) (setting forth a standard for police stops of vehicles believed to be carrying persons wanted on warrants)). For officers to possess constitutionally valid grounds to make these stops, the Sixth Circuit requires that they have "reasonable suspicion, based on all the facts presented to them, to believe that [the person wanted on a warrant] was an occupant of the vehicle" being stopped. *Id.* To satisfy the requirement of reasonable suspicion, the officer stopping a vehicle "must be able to point to specific and

20

articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). *Terry* analysis asks, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19-20. As in other cases involving vehicle stops, the Court looks at the totality of the circumstances when asking whether reasonable suspicion was established. *Hudson*, 405 F.3d at 432 (citing *Northrop v. Trippett*, 265 F.3d 372, 381 (6th Cir. 2001)).

Here, applying *Hudson*, the Court must determine whether it was reasonable for law enforcement officers to stop the blue Camaro based on specific, articulable facts that established reasonable suspicion to believe Defendant was inside the vehicle. Detective Dotson testified that he personally observed Defendant emerge from Defendant's confirmed residence. Detective Dotson further testified that he could clearly see Defendant with the aid of binoculars and watched Defendant, aided by an unknown black male, enter a blue Camaro. Detective Dotson recognized Defendant from photographs that he had been shown before he began his surveillance, noting that Defendant had distinct facial tattoos. Detective Dotson reported on the radio channel being used by vice officers what he had observed and that the blue Chevrolet Camaro was leaving the subdivision where Defendant's house was located. There was further testimony that only one road led from the subdivision and it then dead-ended into Kingsport Highway a very short distance later. There were law enforcement officers located on both sides of the turn onto Kingsport Highway. Officers Shaffer and Bays observed the blue Camaro when it came to a stop before making the turn onto Kingsport Highway and recognized Defendant as the driver. They pulled out behind Defendant's vehicle and when Defendant began to turn into the commercial strip mall where Dashboard Audio was located, they pulled in behind him with Officer Shaffer activating his

lights. Officers then approached the vehicle and visually confirmed from that it was Defendant located in the driver's seat. Defendant was detained pursuant to the warrant and was *Mirandized*.

At the hearing on the suppression motions, Defendant's counsel attempted to demonstrate that Officers Shaffer and Bays would have been unable to see and identify Defendant when he was at the stop sign preparing to turn onto Kingsport Highway. However, the Court notes that given the distinct nature of the car Defendant was driving, the fact that there was almost no elapse of time between Detective Dotson reporting on the radio that Defendant was leaving his home in the blue Camaro, and because there was only one exit from Defendant's subdivision, the Court would find that even if officers had been unable to visually confirm Defendant's identity there would have been reasonable suspicion to stop his vehicle.

While Defendant cites to several cases to support his contention that there was not reasonable suspicion to conduct a *Terry* stop of his vehicle, the one most closely analogous to the facts present here is *United States v. Hudson*, 405 F.3d 425, 428 (6th Cir. 2005). In that case a warrant had been issued for the defendant over a year before he was stopped but officers had been unable to locate him. Officers received an anonymous tip letting them know where the defendant's girlfriend worked and what vehicle she drove. *Id.* at 428-29. A detective was able to confirm the information regarding the girlfriend's place of employment and to determine when she was next scheduled to work. *Id.* When the girlfriend arrived at work in the car that had been described to officers, they approached the vehicle with guns drawn and found that the defendant was a passenger in the vehicle. *Id.* While the Court does find that there are certain common points between the authority cited and the instant action, there is a key distinction. In *Hudson,* officers were operating from a partially corroborated anonymous tip and had no particularized information that the defendant would be occupying the vehicle which had been described. Here, multiple

officers testified that only moments before Defendant's vehicle was stopped, Detective Dotson (who had personally observed Defendant entering a blue Camaro and exiting his subdivision) had reported on the police radio that Defendant was driving a blue Camaro and headed toward officers who were stationed in close proximity to Defendant's subdivision.

Given the totality of the circumstances, the Court finds the *Terry* stop undertaken to serve Defendant with his outstanding arrest warrant was constitutional, as borne out by applicable case law. As such, the undersigned recommends that the request to suppress the fruits of the stop and arrest be **DENIED**.

### c. Constitutionality of activities occurring during Defendant's arrest

Defendant separately challenges the recovery of various items from his vehicle and his person during the traffic stop where he was arrested. During the stop, while Defendant was assisted in exiting the vehicle, Officer Shaffer testified that he saw the end of a black firearm sticking out from below Defendant's seat, which the officer then retrieved for officer safety while alerting Officers Bay and Legg, who were also at the car, of the gun's presence by announcing "gun." Officers further observed Defendant hand cash to the vehicle's passenger and then as he was exiting the car with the assistance of officers, they observed him attempt to place in his pocket a plastic bag, which he ultimately dropped. The bag contained what appeared to be heroin. Based on the presence of suspected heroin, a K9 sniff test was performed around the vehicle while Defendant and the passenger were restrained and under the supervision of officers. The K9 officer signaled the presence of illegal substances, and a full search of the vehicle was undertaken. The vehicle search recovered additional items Defendant now seeks to suppress.

Circuit law clearly establishes that "an alert by a properly trained dog can establish probable cause for a search." *United States v. Figueredo-Diaz*, 718 F.3d 568, 575 (6th Cir. 2013)

(citing *Florida v. Harris*, 133 S. Ct. 1050, 1057, 185 L. Ed. 2d 61 (2013)); *see also United States v. Whitley*, 34 F.4th 522 (U.S. 6th Cir. 2022) (affirming that a trained drug dog's positive sniff formed probable cause for a warrantless search of a vehicle). The Court notes that this search could touch any place in the vehicle where suspected drugs might be located, including inside the bag officers located in the backseat. *United States v. Murray*, No. 3:16-CR-160, 2017 WL 2481272, at *3 (S.D. Ohio June 8, 2017), *aff'd,* 769 F. App'x 273 (6th Cir. 2019).

Defendant makes much of the fact that he was allegedly detained at the scene for a period of almost two hours, which he claims unreasonably extended the stop at issue. However, the Court notes that Defendant was immediately arrested as opposed to simply being detained. As to the search of the vehicle, the Court notes that the K9 Officer Bays was on the scene when Defendant's vehicle was initially stopped and assisted in removing Defendant from the car. There is no indication of any significant delay between the time that officers observed Defendant drop the suspected heroin and the K9 sniff being undertaken. Given that the suspected heroin provided officers with the necessary basis for conducting a K9 sniff test, that the test was promptly undertaken and that the K9 alerted to the vehicle, the Court finds that the search was proper and that the evidence obtained as a result thereof was properly gathered. Accordingly, the undersigned recommends that Defendant's request to suppress the fruits of the search of his vehicle be **DENIED**.

### d. *Constitutionality of later custodial questioning*

Defendant also challenges the constitutionality of what he characterizes as being subjected to custodial questioning prior to his intake at the Sullivan County Jail and during his transport to the federal courthouse for arraignment. Law enforcement is generally only required to provide one *Miranda* warning to a suspect. *Treesh v. Bagley*, 612 F.3d 424, 431 (6th Cir. 2010) (citing *Wyrick*

*v. Fields*, 459 U.S. 42, 47-48 (1982)). Even so, there are some circumstances in which additional warnings are necessary before commencement of subsequent custodial questioning. *Id.* "[A]dditional warnings are only required if the circumstances seriously changed between the initial warnings and the interrogation." *Treesh*, 612 F.3d at 432. Waiver of an initial *Miranda* warning remains valid until "the circumstances change so seriously that the suspect's answers to interrogation are no longer voluntary or unless the suspect is no longer making a knowing and intelligent waiver of his rights." *Rogers v. Westbrooks*, No. 3:13-CV-00141, 2019 WL 1331035, at *68 (M.D. Tenn. Mar. 25, 2019).

Here, the record indicates that Officer Bays was asked to sit with Defendant outside at the Sullivan County Jail while the officer who had transported Defendant determined when Defendant could be brought inside for processing. Officer Bays testified that he did not attempt to question Defendant but did ask him about his injuries. Defendant explained that he had been shot and was in pain. Officer Bays testified that he talked to Defendant about requesting medical treatment before going through intake and thereafter simply listened while Defendant talked. Officer Bays advised that Defendant went on to explain to the officer, without prompting, that he used the heroin he had with him when stopped to help him with his pain, and that he was a drug addict. Defendant told him that there was marijuana in the vehicle as well. From the record before the Court, Defendant's statements were provided voluntarily and not in response to questioning. Moreover, while Officer Bays did not provide Defendant with *Miranda* warnings, those warnings had been given to him within a fairly short time before he and Officer Bays spoke. Under applicable law, it does not appear that Officer Bays would have been required to provide new *Miranda* warnings even if he was interrogating Defendant. For these reasons the Court cannot find that use of the statements made by Defendant would violate his rights.

While Defendant seems to indicate that he seeks suppression of the statements he made to Officer Bays because he had been held for an unreasonable time at the scene of his arrest[8] while sitting on the ground, in the heat, and suffering with pain due to his gunshot wounds, the Court notes that Defendant did not make any incriminating statements while in this location. Instead, it was only after Defendant had been transported to the jail and was seated on a bench under an awning at the jail that he made statements which were incriminating. Defendant made no allegations that he was being subjected to improper conditions at the time he made statements to Officer Bays.

Defendant requested that all statements he made be suppressed but does not specifically address those he made during his transport from the jail to the federal courthouse for his initial appearance in federal court. Nevertheless, for clarity of the record, given that testimony was provided regarding these statements during the suppression hearing, the Court will address the issue. Detective Lane testified that before Defendant made any statements while being transported, he reminded Defendant that he had previously been provided with his *Miranda* warnings. He further testified that Defendant then made statements regarding how the drugs found in his car were his, but the weapons had belonged to his passenger. Defendant offered no proof to dispute the testimony of Detective Lane and the Court sees no basis for suppressing the statements Defendant made during his transport. As such, the undersigned recommends that Defendant's requests to suppress statements made at the jail following his transport but prior to his processing and during his transport to the federal courthouse for an arraignment be **DENIED**.

---

[8] In his initial suppression motion, it appears that Defendant contended that he had been held at the scene for four hours. At the hearing in this cause his attorneys questioned officers about whether Defendant had been left sitting on the ground for as much as two hours. While no officer could provide the exact amount of time that Defendant had been left sitting on the ground, the general consensus was that it was for more than an hour but significantly less than two and that part of the delay was due to a shift change for those responsible for coming to the scene to transport Defendant to the jail.

*e. Constitutionality of search of Defendant's home*

Defendant also challenges the search of his home because he claims that probable cause was based on the statements of an unreliable informant. Specifically, Defendant points to the warrant's reliance on the statements of an unnamed home health nurse. Defendant submits that the home health nurse's statements violated HIPPA. Defendant notes that the affidavit provided to obtain the warrant did not address the fact that the informant was as a home health nurse or the fact that she purportedly violated federal law when providing the information at issue to Defendant's probation officer.

Initially, in challenging the validity of the search warrant that was issued for Defendant's home, Defendant has requested an additional hearing pursuant to *Franks v. Delaware.* It is not entirely clear whether he has made this request in order to have the opportunity to challenge the truthfulness of the factual statements made in the affidavit submitted to obtain the search warrant or based upon his claim that important information about the home health nurse informant was omitted from the affidavit.

In this Circuit, "[t]o be entitled to a *Franks* hearing based on an affirmative misstatement, a defendant must 'make[] a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Neal*, 577 F. App'x 434, 450 (6th Cir. 2014) (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978)). Notably, "'there is a higher bar for obtaining a Franks hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement.'" *Neal*, 577 F. App'x at 450 (quoting *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir.2008)). For instance, the "mere allegation that [an] affiant failed to disclose the nature

27

and degree of the confidential informant's criminal activity" does not entitle a defendant to a Franks hearing. *United States v. Franklin*, 622 F. App'x 501, 512 (6th Cir. 2015). With this in mind, the Court will now consider Defendant's request.

Here, Defendant argues the warrant for the search of his home lacked probable cause because the affiant omitted reference to the home health nurse's violation of HIPPA. In considering Defendant's assertion, the Court notes that information gleaned from the nurse-informant was based on the informant's knowledge of Defendant's drug use and trafficking and firearms from because of her time working in his home. *See* [Doc. 82-2]. As a preliminary matter, and before considering the informant's purported HIPPA violation, the Court has considered whether the informant's reporting was otherwise reliable. In finding in the affirmative, the Court notes that information obtained from an individual who has observed ongoing criminal conduct, namely a suspect's possession of weapons as a felon and use of and trafficking in illegal drugs, as a result of employment in the suspect's home carries the requisite indicia of reliability. *See United States v. Moore*, 661 F.3d 309, 313 (6th Cir. 2011) (quoting *United States v. Smith,* 182 F.3d 473, 478 (6th Cir.1999)) (reminding courts that "[s]o long as the magistrate 'was informed of some of the underlying circumstances from which the informant concluded evidence of a crime is where he claimed it would be found, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, was reliable,' there is sufficient support.") While the affidavit does not specifically provide reasons that the Officer believed that the nurse herself was reliable, the officer detailed in the affidavit other information that corroborated what she had told him, including that they had learned through other interviews and debriefs that Defendant was "a major distributor of heroin" and had multiple convictions for "Sale of Cocaine." The affidavit also noted that Defendant's sentencing documents noted that he

28

was a gang member and the home health nurse had advised that she had reason to believe that others living in Defendant's home were gang members. The officer further noted that a separate confidential informant had advised that Defendant was selling heroin. Moreover, the affidavit noted that per the terms of Defendant's state probation he was subject to searches even without a warrant[9]. Given the totality of the information provided in the affidavit, the statements of Defendant's home health nurse were sufficiently corroborated to demonstrate that they were reliable. The Court will next evaluate the home health nurse's alleged HIPPA violation and federal criminal law violation and any impact that may have on the warrant's probable cause.

Defendant has not presented the Court with any binding authority nor is it aware of any which would support the proposition that healthcare providers are precluded from reporting suspected criminal conduct by patients under HIPPA or federal criminal law. To the contrary, persuasive in-circuit caselaw suggests that HIPPA is not violated by a healthcare provider who warns law enforcement of suspected illegal conduct known to them by virtue of their interactions with a patient. *See United States v. Mathis*, 377 F. Supp. 2d 640, 645 (M.D. Tenn. 2005) (holding that there was no violation of HIPAA where a healthcare provider supplied information to the FBI regarding a defendant's potential criminal conduct because the information did not fall within HIPAA's definition of "protected health information" and the FBI, as a law enforcement agency, was not a "covered entity" under HIPAA). Even assuming, *arguendo*, that healthcare workers are barred from reporting certain criminal conduct of a patient when such conduct is observed in the course of their employment, the Sixth Circuit has explained that mere omission of an informant's criminal conduct does not provide an independent basis for a *Franks* hearing. *See Franklin*, 622

---

[9] Condition number 7 of Defendant's state probation subjected him to warrantless searches of his person, home, etc. The condition specifically stated that reasonable suspicion was not required to conduct a search. These conditions have been found by the Sixth Circuit to be constitutional. *See United States v. Tessier*, 814 F.3d 432, 433 (6th Cir. 2016).

F. App'x at 512. As such, the request for a *Franks* hearing to further probe the sufficiency of the warrant is without merit. The Court finds the warrant was supported by probable cause.

Given the above, the undersigned recommends that Defendant's request to suppress the evidence obtained through the search of his home based upon his assertion that the warrant was issued without probable cause be **DENIED**.

### f. *Constitutionality of the search of Defendant's iPhone*

Lastly, Defendant has challenged the constitutionality of the search of his iPhone. As the Court has previously explained, a warrant is sufficient if it is supported by probable cause. "The test for probable cause is simply whether there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Presley*, 541 F. Supp. 3d 825, 831 (S.D. Ohio 2021) (internal citations omitted). Courts look within the four-corners of the warrant affidavit in considering whether that standard is met. *Presley*, 541 F. Supp. 3d at 531 (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

Here, the warrant for the iPhone provides an ample basis for a search. Agent Jamie Jenkins, who sought the warrant, noted in the affidavit that he had 20 years of experience serving as an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") and was with the Carter County Sheriff's Department for 12 years prior to going to BATFE. In the course of his work, he advised that he had obtained extensive experience in investigating narcotics matters and requesting search warrants. [Doc. 92-6]. Agent Jenkins went on to explain that there had been an ongoing investigation of Defendant over the previous several months due to suspicions that Defendant was buying and selling cocaine and heroin. He then included a detailed description of the observations of Defendant which had been provided by the home health nurse-informant, who he identified as "Concerned Citizen Informant." He noted that this informant had observed

30

Defendant use illegal substances and had seen him conduct drug deals. Agent Jenkins further provided that a separate confidential informant had reported that Defendant was selling heroin from his home. In addition to these tips received, Agent Jenkins advised that when Defendant's probation officer went to his residence for a home check, they observed the license tags of vehicles in the driveway and one of them came back as being registered to another individual who is the primary suspect in and ongoing drug and weapons violation investigation. At that point, Defendant had also been arrested so Agent Jenkins was able to detail the drugs and guns found in Defendant's vehicle at the time of Defendant's arrest.

After providing specifics related to Defendant, Agent Jenkins explained that based upon his training and experience as a law enforcement officer and agent he had learned that "those involved in drug trafficking activities commonly use cellular telephones, to include the text messaging capabilities, to contact others to discuss and arrange drug transactions and to further their illicit drug business. … [and] to maintain records relating to their drug trafficking activities…" Based upon his experience and the information that he had received about Defendant's purported drug use, Agent Jenkins asserted that he had probable cause to believe that Defendant's phone would have information stored on it which would serve as evidence of Defendant's drug trafficking. The undersigned agreed with Agent Jenkins' conclusion in originally issuing the warrant and Defendant has not provided adequate reason for the Court to reach a different conclusion at this juncture. The Court finds that information contained in the affidavit, when taken as a whole, made it "fair[ly] prob[able]" that Defendant's iPhone was used to engage in his suspected drug transactions. As such, the undersigned recommends that Defendant's request to suppress evidence obtained from the search of his iPhone because he contends there was not probable cause for the search warrant to issue be **DENIED**.

Case 2:20-cr-00072-DCLC-CRW    Document 97    Filed 07/15/22    Page 31 of 32
PageID #: 533

## IV.    CONCLUSION

For reasons offered above, the Court **RECOMMENDS** Defendants' pending Motions [Docs. 51, 71, and 91] be **DENIED**.[10]

Respectfully submitted,

s/Cynthia Richardson Wyrick
United States Magistrate Judge

---

[10] Any objections to this report and recommendation must be served and filed by close of business on **JULY 22, 2022**. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections within the designated time waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

32